IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
CIVIL ACTION NO. 4:15-cv-42-BR

KIRSTEN MESSMER, )
 )
       Plaintiff, )
 )
v. )
 )
DONNIE HARRISON, in his Official )
Capacity as Sheriff of Wake County, North ) **MEMORANDUM IN SUPPORT OF**
Carolina, PAT McCRORY, in his Official ) **MOTION FOR PRELIMINARY**
Capacity as Governor of North Carolina, ) **INJUNCTION**
ROY COOPER, in his Official Capacity as )
Attorney General of North Carolina, and )
FRANK L. PERRY, in his Official )
Capacity as Secretary of the North )
Carolina Department of Public Safety, )
 )
       Defendants. )

## INTRODUCTION

North Carolina General Statute § 14-415.12(a)(1) denies otherwise-qualified lawful permanent resident aliens the ability to obtain a North Carolina concealed handgun permit. This statute discriminates against persons solely on the basis of citizenship, even when those persons are permanent residents of the United States residing here lawfully. This law plainly violates the rights of Ms. Messmer, a lawful permanent resident alien, to equal protection under the laws and to keep and bear arms.

Ongoing deprivation of a person's Constitutional rights is irreparable harm because no monetary damages can compensate a person whose Constitutional rights are being deprived. And, in Ms. Messmer's case, application of North Carolina's unconstitutional statute will produce the bizarre result that she will *lose* her right to carry a concealed handgun. Ms. Messmer already has the right to carry a concealed handgun by operation of North Carolina's

1

reciprocal recognition of Ms. Messmer's Utah concealed handgun permit, but once that permit expires, Ms. Messmer cannot renew the permit without North Carolina first issuing her a concealed handgun permit. Preliminary injunctive relief is therefore necessary to ensure Ms. Messmer does not lose this right when her Utah permit expires on July 15, 2015.

Finally, North Carolina's unconstitutional restriction on issuance of concealed handgun permits poses an immediate threat to public safety, because an entire class of North Carolina residents has been and continues to be wrongfully denied their right and ability to defend themselves from criminal attack. North Carolina has no valid interest in banning lawful permanent resident aliens from obtaining concealed handgun permits and thereby lawfully carrying concealed handguns in public for self-defense.

## STATEMENT OF FACTS

Ms. Messmer recently moved to North Carolina after residing in Maryland for 12 years. Declaration of Kirsten Messmer ("Messmer Decl.") ¶ 3, attached as Exhibit A. She has been a resident of the United States since 2002, and in 2006 she obtained her "green card," signifying that she is a lawful permanent resident alien. *Id.* ¶ 4. Ms. Messmer is employed as a Senior Regulatory Affairs Specialist for a contract research organization serving the pharmaceutical industry. She received a Ph.D. in Neurobiology in 2001 from the University of Sheffield in England. *Id.* ¶ 5. Ms. Messmer also is an avid firearms enthusiast and has completed 8 different firearms training courses, including courses in basic firearms safety, firearms safety in the home, and defensive use of handguns. *Id.* ¶ 6.

In 2010, Ms. Messmer obtained a concealed handgun permit from the State of Utah. Messmer Decl. ¶ 7. At the time, Utah issued concealed handgun permits to non-residents, and Ms. Messmer obtained a Utah permit because Utah issues permits to non-residents who live in states that do not allow concealed handgun permits, which Maryland does not. *Id.* Pursuant to

the rights afforded by that permit and by operation of North Carolina's reciprocity statute, N.C.G.S. § 14-415.24, Ms. Messmer can currently carry a concealed handgun in North Carolina. Ms. Messmer's Utah permit is valid through July 15, 2015. *Id*. ¶ 7. However, due to a change in Utah's statutes regarding concealed handgun permits, Ms. Messmer cannot renew her Utah permit without first obtaining a concealed handgun permit from her current state of residence, North Carolina. *Id*. ¶ 8. And, in any event, Ms. Messmer has moved to North Carolina and desires to make this state her permanent residence, and she wants to obtain a concealed handgun permit issued by her home state. *Id*. ¶ 9.

Ms. Messmer cannot do so because North Carolina restricts issuance of permits to United States citizens. Moreover, no one in North Carolina is allowed to carry a concealed handgun unless that person is on her own property or that person has obtained a concealed handgun permit. The first time a person violates this law, she can be charged with a misdemeanor, and a second offense can be charged as a felony. Therefore, if a lawful permanent resident alien intends to abide by North Carolina law, as does Ms. Messmer, she is prohibited from carrying a concealed handgun in public without legal authority to do so. On July 16, 2015, Ms. Messmer will no longer have that legal authority.

Ms. Messmer's need for a concealed handgun permit is particularly acute. Ms. Messmer is an avid photographer, and her photography interests take her to isolated areas where she can photograph nature, landscapes, and the like. Messmer Decl. ¶ 11. When she does so, she travels alone with expensive photography equipment, and she is often miles from any law enforcement presence. *Id*. She therefore believes that she needs a handgun for her personal safety. *Id*.

But more importantly, Ms. Messmer needs a handgun because of a danger presented by her ex-husband. In 2010, Ms. Messmer divorced her husband, from whom she had suffered abuse. Messmer Decl. ¶ 12. Her ex-husband's conduct was so bad that Ms. Messmer took the

3

extraordinary steps of obtaining a protective order against her ex-husband and entering into Maryland's "Safe at Home" program, which concealed her whereabouts. *Id*. Having lived in this manner for 5 years, Ms. Messmer, upon her relocation to North Carolina, decided to cease her efforts to completely cloak her whereabouts. *Id*. However, she believes that she still must be vigilant and that she requires the ability to defend herself. *Id*. As of July 16, 2015, she will no longer have the ability to carry a concealed handgun in public to protect her safety.

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). Ms. Messmer satisfies all these threshold requirements for obtaining preliminary injunctive relief.

**I.    The Second and Fourteenth Amendments apply to Ms. Messmer and protect her from discrimination based on her citizenship.**

**A.    North Carolina's concealed handgun permit law discriminates against lawful permanent resident aliens, and application of this law will result in the loss of Ms. Messmer's presently-existing right to carry a concealed handgun.**

The State of North Carolina restricts issuance of concealed handgun permits to United States citizens. Under N.C.G.S. § 14-415.12(a)(1), "The sheriff shall issue a permit to an applicant if the applicant qualifies under the following criteria: (1) The applicant is a *citizen of the United States* and has been a resident of the State 30 days or longer immediately preceding the filing of the application." (emphasis added).

It is a crime to carry a concealed handgun in public without first being issued a concealed handgun permit. Under N.C.G.S. § 14-269(a1), a person may not willfully and intentionally carry a concealed weapon unless the person is on her own premises or the person is carrying a concealed

4

handgun while possessing a concealed handgun permit and carrying said handgun within the scope of the permit. Any person violating this law "shall be guilty of a Class 2 misdemeanor for the first offense." N.C.G.S. § 14-269(c). A second offense is punishable as a Class I felony. *Id.* A person convicted of a Class 2 misdemeanor with no prior convictions may receive a sentence of up to 30 days, with community punishment authorized and a maximum $1000.00 fine. N.C.G.S. § 15A-1340.23(c). A person convicted of a Class I felony with one Class A1 misdemeanor conviction may receive a presumptive sentence of 4-17 months, with community punishment authorized and a fine subject to the court's discretion. N.C.G.S. § 15A-1340.23(c). These statutes prohibit Ms. Messmer and all other lawful permanent resident aliens from obtaining a concealed carry permit.

There is no doubt that North Carolina law discriminates against Ms. Messmer based upon her citizenship, but the discrimination against Ms. Messmer is exacerbated by the fact that she presently has a right to carry a concealed handgun. Ms. Messmer obtained her Utah permit in 2010, and it is valid until July 15, 2015. North Carolina recognizes the Utah permit as valid pursuant to N.C.G.S. § 14-415.24, and Ms. Messmer can therefore carry a concealed handgun in North Carolina so long as her Utah permit is valid. However, Utah now requires that a non-resident living in a state with reciprocity obtain a concealed handgun permit from her state of residence in order to renew the Utah permit. This Ms. Messmer cannot do, and North Carolina law will therefore deny Ms. Messmer a presently-existing right to carry a concealed handgun when her Utah permit expires on July 15, 2015.

### B. The Second and Fourteenth Amendments protect Ms. Messmer against the discrimination imposed by North Carolina's concealed handgun permit law.

The United States Supreme Court has settled the question of whether a lawful permanent resident alien like Ms. Messmer enjoys Second and Fourteenth Amendment rights. The Second

Amendment protects "the right of *the people* to keep and bear arms[.]" U.S. Const., Amdmt. 2 (emphasis added). "The people" protected by the Second Amendment "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990).

The Fourteenth Amendment guarantees all persons equal protection of the law, and "persons" in this context "encompasses lawfully admitted resident aliens as well as citizens of the United States and entitles both citizens and aliens to the equal protection of the laws of the State in which they reside." *Graham v. Richardson*, 403 U.S. 365, 371 (1971) (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886)). State action violates equal protection rights if it separates individuals into discrete classes based on citizenship and subjects those individuals to disparate treatment. *Graham*, 403 U.S. at 371, 377. A classification based on an individual's status as an alien is "inherently suspect and subject to close judicial scrutiny." *Id.* at 372. "Aliens as a class are a prime example of a 'discrete and insular' minority for whom such heightened judicial solicitude is appropriate." *Id*. (citation omitted). Moreover, lawful permanent resident aliens in the United States have been extended the same Constitutional rights as citizens for more than one hundred years. *See, e.g.*, *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 (1953) (resident alien is a "person" within the meaning of the Fifth Amendment); *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) (resident aliens have First Amendment rights); *Russian Volunteer Fleet v. United States*, 282 U.S. 481 (1931) (Just Compensation Clause of Fifth Amendment); *Wong Wing v. United States*, 163 U.S. 228, 238 (1896) (resident aliens entitled to Fifth and Sixth Amendment rights).

The government may not deny lawful permanent resident aliens their Second Amendment rights based upon their citizenship. The Tenth Circuit addressed the issue of the constitutionality of 18 U.S.C. § 922(g)(5) as applied to an illegal alien, an issue not confronted here. *United States*

*v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012). However, in discussing the post-*Heller* litigation, the Court noted as to lawful permanent residents like Ms. Messmer:

> The thrust of *Heller*, or at least the intended thrust of much post-*Heller* litigation, has been to broaden the right. Recently some state statutes that burden gun possession by lawful permanent aliens (which § 922(g)(5) does not cover) have been declared invalid under the Equal Protection Clause, which requires that strict scrutiny be applied to state laws that impose restrictions based on alienage. *See, e.g., People v. Bounsari*, 31 Misc. 3d 304, 915 N.Y.S.2d 921, 924 (N.Y. City Ct. 2011)(invalidating New York statute dating from 1905, prohibiting non-citizens from possessing a dangerous weapon, and noting related decisions in Michigan, Nevada, California); *Fletcher v. Haas*, [851 F. Supp. 2d 287, 301] (D. Mass. Mar. 30, 2012)(holding that Massachusetts's firearm regime contravenes the Second Amendment as applied to lawful permanent residents).

*Huitron-Guizar*, 678 F.3d at 1170.

Courts distinguish between the lawful permanent resident alien and the illegal alien, where the lawful resident possesses Second Amendment rights and the illegal alien does not. *See, e.g., United States v. Boffil-Rivera*, 2008 U.S. Dist. LEXIS 84633 at *32 (S.D. Fla. Aug. 12, 2008) ("Congress has made a policy judgment, as it has in numerous other statutes, that *unlike citizens and legal residents*, illegal aliens by their very unauthorized nature and lack of allegiance to the government of the United States pose a greater risk to abuse firearms.")(emphasis added); *United States v. Flores-Higuera,* 2011 U.S. Dist. LEXIS 84934 at *5 (N.D. Ga. July 6, 2011)("Because Defendant is not a citizen, or at the least, a lawful resident with ties to the community, the Court concludes that he is not a member of the 'political community' whose rights are protected by the Second Amendment."); *Fletcher v. Haas*, 851 F. Supp. 2d 287, 301 (D. Mass. 2012)("I find no justification for refusing to extend the Second Amendment to lawful permanent residents. They have necessarily developed sufficient connection with this country to be considered part of the community.)(quotations omitted); *State of Washington v. Ibrahim*, 164 Wash. App. 503, 514 (Wash. App. Div. 3, 2011) (legal alien's conviction for unlawful possession of firearm reversed

7

when statute barring lawful aliens from possessing firearms found to unconstitutionally deny defendant Fourteenth Amendment right to equal protection of law).

Considering that North Carolina's concealed handgun permit law discriminates against lawful permanent resident aliens, the State will have to justify this law under strict scrutiny. For example, in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), the Seventh Circuit compared the analysis of infringements of Second Amendment rights to those of infringements of First Amendment rights and concluded that infringements on the core Second Amendment right of possession for self-defense must satisfy a level of scrutiny approaching strict scrutiny. *Id.* at 708. Thus, "a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end." *Id.*

This District has applied strict security when analyzing the issue of infringement of Second Amendment rights. In *Bateman v. Perdue*, 881 F. Supp. 2d 709 (E.D.N.C. 2012), plaintiffs challenged a North Carolina law that prohibited residents from bearing arms for self-defense when a state of emergency was declared. Judge Howard struck the law, holding that it was an unconstitutional violation of Second Amendment rights. *Id.* at 716. The Court applied strict scrutiny to the prohibition, because the plaintiffs were law-abiding residents of the State. *Id.* at 715. Ms. Messmer deserves the same consideration, especially since she is a member of a suspect class being discriminated against solely for that reason.

North Carolina cannot justify discrimination against lawful permanent resident aliens. The law views citizens and lawful permanent resident aliens the same, and there is no basis for discrimination. Certainly, there is no "extremely strong public-interest justification," *Ezell*, 651 F.3d at 708, for denying concealed carry to lawful permanent resident aliens, and the State simply will not be able to identify "a close fit between the government's means and its end." *Id.*

Highlighting the unconstitutionality of N.C.G.S. § 14-415.12, North Carolina treats lawful permanent resident aliens the same as citizens regarding *all other firearms rights*. North Carolina has no citizenship requirement for the purchase of long guns, for the purchase of pistols, for the open carrying of firearms, or for the concealed carry of weapons on one's own premises. North Carolina even allows aliens to carry concealed handguns when they hold permits issued by other states. However, the State arbitrarily decided that lawful permanent resident aliens cannot obtain concealed handgun permits issued by North Carolina. Under any level of scrutiny, this law must fail.

**C. Ms. Messmer will prevail on the merits, because North Carolina law plainly violates the Second and Fourteenth Amendments.**

As detailed above, North Carolina's concealed handgun permit law impermissibly discriminates lawful permanent resident aliens, and Ms. Messmer has made a clear showing she will win on the merits. Moreover, United States District Courts throughout the country have enjoined firearms laws like North Carolina's. The District of Hawaii recently enjoined a ban on lawful resident aliens from obtaining a permit to purchase firearms. *Fotoudis v. City and County of Honolulu*, 2014 U.S. Dist. LEXIS 130525 (D. Hawaii, September 17, 2014). The Court held:

> The undisputed facts establish that Fotoudis, as a lawful permanent resident alien of the United States (and resident of Hawaii), was denied the opportunity to apply for a permit to acquire firearms solely because of his alienage. This classification violates the equal protection clause of the U.S. Constitution. HRS § 134-2(d) is thus unconstitutional as-applied to Fotoudis (and other lawful permanent resident aliens), and Defendants are therefore permanently enjoined from denying Fotoudis the opportunity (1) to apply for a permit to acquire firearms, and (2) to obtain such a permit, if he otherwise meets the qualifications of state law, as specifically set forth in the Conclusion of this Order.

*Id.* at *9.

Further, in *Jackson v. Eden* [prev. *Hubbard*], 1:12-CV-421 (D.N.M.), a New Mexico statutory restriction identical to that challenged here was permanently enjoined as a violation of Fourteenth Amendment equal protection grounds on March 31, 2014. *See* Judgment in 1:12-CV-421, attached hereto. In the Opinion accompanying the Judgment, the Court stated:

> There is no argument made, much less any evidence proffered, that permanent resident aliens who reside in this country legally pose a greater danger when carrying a concealed loaded firearm than do United States citizens. Indeed, '[a]ny classification which treats all aliens as dangerous and all United States citizens as trustworthy rests upon a very questionable basis.' *Id.* at Doc. 59, p.9 (quoting *People v. Rappard*, 28 Cal.Ct.App. 302, 305 (Cal.Ct.App. 1972); *Fletcher*, 851 F.Supp.2d at 303 ("Any classification based on the assumption that lawful permanent residents are categorically dangerous and all American citizens by contrast are trustworthy lacks even a reasonable basis.")).

The *Jackson* court concluded that New Mexico's citizenship requirement "violates the Equal Protection Clause of the United States Constitution as applied to permanent resident aliens, like Plaintiff Jackson, who are otherwise qualified to obtain a concealed carry license." *Jackson*, 1:12-CV-421 at Doc.59, p.10.

Finally, in 2011, South Dakota's law prohibiting lawful permanent resident aliens from obtaining concealed carry permits was held to be not narrowly tailored and a violation of the Equal Protection Clause. *Smith v. State of South Dakota*, 781 F. Supp. 2d 879, 886 (D.S.D. 2011).

As shown by these cases, restricting lawful permanent resident aliens from exercising their Second Amendment rights is indefensible, and discrimination in favor of United States citizens is unconstitutional. Because North Carolina plainly discriminates against persons like Ms. Messmer in the issuance of concealed handgun permits, Ms. Messmer has shown that she will succeed on the merits of her claims.

**II.   Ms. Messmer will suffer irreparable harm in the absence of preliminary injunctive relief.**

Ms. Messmer enjoys a fundamental right to keep and bear arms. *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3042 (2010). The denial of constitutional rights, even if such deprivation were temporary, constitutes irreparable harm for purposes of granting injunctive relief. *See*, *e.g.*, *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013)(First Amendment freedom of speech)(citing *Elrod v. Burns*, 427 U.S. 347, 373, (1976)); *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011) (unconstitutional ban on adult entertainment by establishments with liquor license a violation of First Amendment).

As noted above, in *Ezell* the Seventh Circuit favorably compared the fundamental freedoms of the Second Amendment to those fundamental freedoms of the First Amendment. The *Ezell* court held the deprivation of either to be irreparable harm, stating that "[t]he loss of a First Amendment right is frequently presumed to cause irreparable harm based on 'the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future.' The Second Amendment protects similarly intangible and unquantifiable interests. *Heller* held that the Amendment's central component is the right to possess firearms for protection. Infringements of this right cannot be compensated by damages." *See Ezell*, 651 F.3d at 699. Put simply, if N.C.G.S. § 14-415.12(a)(1) is not enjoined, lawful permanent resident aliens, including Ms. Messmer, will continue to be unconstitutionally frustrated in their ability to exercise their fundamental Second Amendment rights.

The Second Amendment exists to secure the right of armed self-defense. North Carolina law prevents lawful permanent resident aliens from defending themselves against violence in a manner allowed not only by the vast majority of the United States, but also allowed to North

Carolina residents who are United States citizens. Having this right denied results in a profound loss of a sense of one's security, to say nothing of the irreparable harm resulting from a successful criminal attack.

Moreover, the deprivation of the right of lawful permanent resident aliens to be treated equally under the law, and instead being discriminated against due to their citizenship, is an irreparable harm that continues so long as the offending statute is in place. Equal protection "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). "When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (citing 11A Charles Alan Wright *et al*., Federal Practice and Procedure § 2948.1 (2d ed. 1995)).

There is also no way to quantify in money damages the inability to engage in protected Second Amendment activity such as the concealed carry of a handgun for self-defense, or the discrimination of being classified solely based on citizenship in violation of Fourteenth Amendment equal protection rights. The infringement of constitutional rights is frequently considered to be beyond quantification. This includes infringements of Second Amendment rights. *See Ezell*, 651 F.3d at 699.

No legal remedies will be available to Ms. Messmer and other lawful permanent resident aliens whose concealed handgun permits are refused because they are denied Second Amendment rights and the equal protection of North Carolina's firearms laws. And quite obviously, no legal remedies will suffice to compensate those killed or injured for the inability to lawfully possess concealed defensive arms, owing to North Carolina's ban.

### III. The balance of interests favors immediate injunctive relief.

The balance of interests weighs heavily in Ms. Messmer's favor. She presently has a right to carry a concealed handgun in North Carolina by virtue of her Utah concealed handgun permit. That right could be lost once the Utah permit expires, solely because of North Carolina's unconstitutional discrimination against her. The State can have no interest in such a result.

But more importantly, Ms. Messmer's need for a concealed handgun permit is particularly acute, and the State's denial of her ability to carry a concealed handgun presents a particularly meritorious case for granting this injunction. Ms. Messmer legitimately fears for her safety based upon her ex-husband's abusive conduct. Her fear even prompted her to enter Maryland's "Safe at Home" program and cloak her whereabouts for 5 years. Although she opted to leave this program when she moved to North Carolina, she still is concerned for her safety and should be entitled to carry a concealed handgun for self-defense. Moreover, Ms. Messmer's photography work takes her into situations where carrying a handgun for protection is warranted. These factors, combined with the fact that Ms. Messmer has significant handgun training and experience, present a more compelling case for Ms. Messmer to carry a concealed handgun than many North Carolinians who enjoy that right because they are United States citizens. Under such circumstances, the balance of interests weighs heavily in Ms. Messmer's favor.

### IV. The requested injunction is in the public interest.

Ms. Messmer has shown that she will likely prevail on the merits, to a large extent because the State has no legitimate interest in prohibiting lawful permanent resident aliens from obtaining concealed handgun permits. Because the State discriminates against non-citizens, an entire class of persons is currently being denied a right that United States citizens enjoy. Moreover, the right that the State denies is one of the most fundamental rights—the right to defend oneself. It is therefore

13

Case 5:15-cv-00097-BO   Document 3   Filed 03/10/15   Page 13 of 14

in the public interest that lawful permanent resident aliens be treated the same as United States citizens for the purposes of North Carolina's concealed handgun permits.

## CONCLUSION

Ms. Messmer has shown that she is entitled to an injunction prohibiting Defendants from enforcing the citizenship requirement of N.C.G.S. § 14-415.12. North Carolina simply cannot bar otherwise qualified lawful permanent resident aliens from obtaining concealed handgun permits. The State has no interest, let alone an extremely strong one, in denying this class of persons their fundamental Second and Fourteenth Amendment rights. Moreover, Ms. Messmer already has a right to carry a concealed handgun, which will be taken away on July 16, 2015, by operation of an unconstitutional statute. Under such circumstances, a preliminary injunction against the enforcement of the citizenship requirement of N.C.G.S. § 14-415.12(a)(1) should be immediately entered.

This the 10th day of March, 2015.

WILLIAMS MULLEN

BY: /s/Camden R. Webb
Camden R. Webb
N.C. State Bar No. 22374
crwebb@williamsmullen.com
301 Fayetteville Street, Suite 1700
Raleigh, NC 27601
P.O. Box 1000
Raleigh, NC  27602
Telephone (919) 981-4000
Facsimile (919) 981-4300
*Attorneys for Plaintiff*